UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
GANG CHEN, DOES 1-3, WENBO ZOU, :
HUIMIN WANG, XIN LI, CHNGZHEN SUN, :
and OTHERS SIMILARLY SITUATED, :
                Plaintiffs, :        06 Civ. 414 (PAC)
                 :
   -   against - :        OPINION & ORDER
                 :
CHINA CENTRAL TELEVISION and DOES 1-5, :
                Defendants. :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                HONORABLE PAUL A. CROTTY, United States District Judge:

                Plaintiffs Gang Chen, Does 1-3, Zou Wenbo, Huimin Wang, Xin Li, and Changzhen Sun ("Plaintiffs") move for entry of a default judgment in their action against China Central Television ("CCTV"),[1] an instrumentality of the government of the People's Republic of China ("PRC"). Plaintiffs, who are residents of the PRC, refugees from the PRC, or aliens who visit the PRC, allege they were subjected various violations of internationally recognized human rights, including, inter alia, genocide, torture, arbitrary arrest and imprisonment, and religious persecution. The identities of the actual individual perpetrators of these acts are not provided, but Plaintiffs claim that television programs produced and aired by CCTV aided, abetted, and contributed to the alleged human rights abuses. Plaintiffs assert subject matter jurisdiction based on the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, and the Torture Victims Protection Act of 1991 ("TVPA"), Pub. L. No. 102-256, 106 Stat. 73 (1992), codified at 28 U.S.C. § 1350 note (Supp. V 1993).

---

[1] Though Plaintiffs name "Does 1-5" as Defendants in the caption of their Complaint, they make no allegations concerning the Doe Defendants, and indeed regularly refer to CCTV as the singular "Defendant."

An organization which styles itself as "The All China Lawyers Association" ("ACLA") submits "suggestions" to the Court, allegedly pursuant to Fed. R. Civ. P. 12(h)(3), that the Court lacks subject matter jurisdiction over this action. Plaintiffs oppose the ACLA's involvement, and, with the Court's permission, submitted additional briefing on the jurisdictional issue. The Court does not rely on the ACLA's submissions, and so does not determine whether its attempted involvement is proper. The Court does, however, find that it lacks subject matter jurisdiction, and must therefore dismiss the Complaint sua sponte.

## RELEVANT FACTS[2]

Plaintiffs are practitioners of Falun Gong, a spiritual meditation practice banned by the PRC. Each of the Plaintiffs generally alleges the wrongs and abuses suffered because of their Falun Gong practices: "unlawfully imprisoned" (Compl. ¶ 13); "brainwashing and torture nearly to death" (Id. at ¶ 14); "severe degradation" (Id. at ¶ 15); and "severely persecuted, tortured and left handicapped" (Id. at ¶ 17). These allegations are elaborated on at some length in the Complaint. Id. at ¶¶ 19-27. All the aforementioned activities are said to be a part of a PRC policy of "disintegrating and eradicating the Falun Gong movement." Id. at ¶ 28.

As part of this "national policy" originated and orchestrated at the highest levels of the PRC, its state-owned television station, CCTV, produced, broadcasted and disseminated material designed to "organize and support" the anti-Falun Gong abuses, and to "mobilize the public to become actively involved in the persecution" of Falun Gong practitioners. Id. at ¶ 31. CCTV's programs were also intended to instigate and incite security officials against Falun Gong practitioners. The CCTV material included

---

[2] These facts are drawn from the Plaintiffs' Complaint. Particular paragraphs are cited only where quoted.

programs "stress[ing] the need to use violence and torture to 'transform' Falun Gong practitioners," id. at ¶ 2, and systematically portraying the Falun Gong as "violent and dangerous criminals and murderers who must be eradicated." Id. at ¶ 10.  In engaging in this "campaign of propaganda," id. at ¶ 20, CCTV was "acting in concert with the Central Committee of [the ruling Chinese Communist Party ("CCP")], the Ministry of Propaganda," and "Office 610, the office established by the Chinese Communist Party and its former chair, Jiang Zemin, to carry out the campaign of persecution…." Id. at ¶¶ 1, 31.  In fact, CCTV is "the mouthpiece of the Chinese Communist Party and has followed its plans and mandates as well as those of the Central Propaganda Department." Id. at ¶ 32.

CCTV programs were also used as a "key and integral element of the torture and brainwashing" practiced upon Falun Gong practitioners. Id. at 11.  In particular, practitioners were forced to sing the "Same Song," a theme song from the CCTV show of the same name.  Similarly, when an individual signed a "guarantee statement" promising not to practice Falun Gong, the Same Song was sung in unison to celebrate his "transformation." Id. at ¶ 27.  The Same Song program was transferred to the stage and performed in New York at Radio City Music Hall on January 23, 2006 under the direction of a CCTV employee.[3]

## DISCUSSION

Before turning to the lack of subject matter jurisdiction that bars the Court from adjudicating Plaintiffs' claims, the Court will briefly address certain other important

---

[3] The Complaint, filed prior to the Same Song performance, named CCTV Director Meng Xin, the director of the Same Song television program, as the employee directing the New York production.  The Clerk's Certificate attached to Plaintiffs motion for a default judgment, however, names CCTV Executive Producer Zhiqiang Liu ("Liu") as the CCTV employee responsible for managing the production.

3

issues which suggest the Court should in any event be reluctant to proceed with this case.

First, even if the Court possessed subject matter jurisdiction over the matter, it is questionable whether it would possess personal jurisdiction over CCTV. In cases involving foreign states or their instrumentalities, personal jurisdiction exists under 28 U.S.C. § 1330(b) whenever the Court has subject matter jurisdiction and service has been made under 28 U.S.C. § 1608. Texas Trading & Milling Corp. v. Federal Republic of Nigeria, 647 F.2d 300, 308 (2d Cir. 1981) ("subject-matter jurisdiction plus service of process equals personal jurisdiction."). Here, service was effectuated by personal service to Liu, the CCTV employee apparently directing the "Same Song" production at Radio City Music Hall, service by Federal Express to cable and satellite companies carrying CCTV broadcasts in the United States, and international service under the Hague Convention which the PRC Ministry of Justice declined to deliver. It is far from clear that the road manager of the "Same Song" performance and arms-length re-broadcasters of CCTV programs constitute its "managing agents" for purpose of service, even assuming they were all properly served themselves. As to the service on the Ministry of Justice, while Plaintiffs assert that the Ministry must have informed CCTV of the Complaint, knowledge of a lawsuit is not a substitute for service of process.

Second, a number of Plaintiffs' claims rest on foundations rejected by the Supreme Court in Sosa v. Alvarez-Machain, 542 U.S. 692 (2004). Plaintiffs' claimed violations of "freedom of thought, conscience, and religion, and the freedom to hold opinions without interference, and to associate freely," Compl. ¶ 50, for example, are explicitly based on the Universal Declaration of Human Rights and the International Covenant on Civil and Political Rights, which the Supreme Court held did not create a

4

cause of action under the ATS. Sosa, 542 U.S. at 734-35.  Moreover, the breadth of this asserted cause of action is totally at odds with the Court's call for "restraint in judicially applying internationally generated norms." Id. at 725.

These jurisdictional and substantive deficiencies of the Complaint are not before the Court, however, as CCTV has not made even a limited appearance in this matter to raise them.  Such questions are, in any case, irrelevant unless the Court first determines that it possesses subject matter jurisdiction over this action.  The Court now turns to that question.

**I. The Court's Obligation to Establish Subject Matter Jurisdiction**

"From the Nation's founding…, foreign states were 'generally granted ... complete immunity from suit' in United States courts, and the Judicial Branch deferred to the decisions of the Executive Branch on such questions." Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434 n. 1 (1989) (quoting Verlinden B.V. v. Central Bank of Nigeria, 461 U.S. 480, 486 (1983).  The FSIA codified and clarified the "restrictive" theory of foreign sovereign immunity, which recognizes several exceptions to immunity from suit, that was adhered to by the State Department after 1952, while removing the necessity for judicial consultation with the Department.  The FSIA now provides the "exclusive means by which federal and state courts may obtain subject-matter jurisdiction over civil suits involving foreign states." Id. at 443.[4]

The Supreme Court has held that "[a]t the threshold of every action in a District Court against a foreign state…the court must satisfy itself that one of the exceptions [to foreign sovereign immunity] applies…." Verlinden B.V., 461 U.S. at 493-

---

[4] CCTV, as an instrumentality of the Chinese government, is a foreign state for FSIA purposes. See 28 U.S.C. § 1603(a).

94.  The Court in <u>Verlinden B.V.</u> expressly disclaimed the view, advanced by Plaintiffs, that sovereign immunity is an affirmative defense which must be pleaded by the defendant:

> The House Report on [the FSIA] states that "sovereign immunity is an affirmative defense that must be specially pleaded," H.R. Rep. No. 94-1487, at 17.  Under the Act, however, subject matter jurisdiction turns on the existence of an exception to foreign sovereign immunity, 28 U.S.C. § 1330(a).  Accordingly, even if the foreign state does not enter an appearance to assert an immunity defense, a District Court still must determine that immunity is unavailable under the Act.

<u>Id.</u> at 494 n. 20; <u>see</u> <u>also</u> <u>Nysa-Ila Pension Trust Fund ex rel. Bowers v. Garuda Indonesia</u>, 7 F.3d 35, 39 (2d Cir. 1993) ("Before a federal court may apply ... any ... rule of law in a case involving a foreign state or instrumentality of that state, it must, as a threshold matter, find an exception to the FSIA's grant of sovereign immunity.").  The fact that CCTV has not appeared in this matter is therefore irrelevant; the Court must dismiss Plaintiffs' claims <u>sua</u> <u>sponte</u> unless they fall within one of the statutory exceptions to immunity set forth in 28 U.S.C. §§ 1605-1607.

**II. Plaintiffs' Claims Do Not Fall Within an Exception to the FSIA**

The Complaint's jurisdictional statement offers two grounds for subject-matter jurisdiction in this case: (1) CCTV's actions are beyond the scope of official authority and so not subject to the FSIA; and (2) the claims fall within the "commercial activity" exception to the FSIA.  In subsequent briefing, Plaintiffs add as a third ground for jurisdiction that the alleged acts fall under a "treaty-based exception" to the FSIA.  The Court finds that none of the alleged bases for inapplicability of foreign sovereign immunity apply to the claims alleged here.

**A. "No Official Authority"**

6

The Complaint asserts that the human rights abuses alleged are "clearly beyond the scope of the official authority of any government or official, and are therefore not the acts of…a foreign state within the meaning of the FSIA." Compl. ¶ 7.[5] While courts have held that the applicability of the FSIA to a foreign official turns on whether he was acting in his official capacity, see, e.g., Cabiri v. Assasie-Gyimah, 921 F.Supp. 1189, 1197 (S.D.N.Y. 1996), this inquiry has no relevance to a corporate instrumentality of a foreign government, such as CCTV. The FSIA applies to such instrumentalities either because they are owned by a foreign state or because they are "an organ of a foreign state or political subdivision" of the state; "official authority" to perform a particular action has no bearing on the matter. See 28 U.S.C. § 1603(b). Even assuming that CCTV lacked such authority for its actions in some sense, the FSIA would still be applicable to the claims against it.

**B. "Treaty-Based Exception"**

In their objections to the ACLA's submissions, Plaintiffs briefly assert that the abuses alleged here violate the Genocide Convention and the Convention against Torture, and therefore are not subject to immunity under 28 U.S.C. § 1604. Plaintiffs argue that "[t]his general treaty-based exception to the grant of immunity under the FSIA embodies the broader principle that immunity claims cannot be recognized for violations of universal human rights standards that cover the most severe abuses…." Plaintiffs' Renewed Objections to Third Party Submissions, 12. Plaintiffs' argument is apparently based on language in § 1604 stating that foreign sovereign immunity is "[s]ubject to existing international agreements to which the United States is a party at the time of

---

[5] In their subsequent briefing of the jurisdictional issue, Plaintiffs have provided no analysis or authority in support of this assertion, and indeed have not referred to it at all.

enactment of this Act….." 28 U.S.C. § 1604.  Plaintiffs badly misinterpret this language, however, and in a manner which the Supreme Court has long since foreclosed.  In Amerada Hess Shipping Corp., the Court rejected the argument that conventions setting forth "substantive rules of conduct" automatically created exceptions to foreign sovereign immunity under § 1604. 488 U.S. 428, 441-442 (1989).  The exception for existing treaties "applies when international agreements 'expressly conflic[t]' with the immunity provisions of the FSIA." Id. at 442 (quoting H.R. Rep. No. 94-1487, at 17 (1976) and S. Rep. No. 94-1310 at 17 (1976), reprinted in 1976 U.S.C. C.A.N. 6604, 6616).  The Genocide Convention and the Convention against Torture "do not create private rights of action for foreign corporations to recover compensation from foreign states in United States courts," and therefore they do not defeat foreign sovereign immunity under § 1604. Id.

**C. The "Commercial Activity" Exception**

> Foreign sovereign immunity does not bar claims that are
>
> based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. 1605(a)(2). "Commercial activity" is defined in the FSIA as "either a regular course of commercial conduct or a particular commercial transaction or act.  The commercial character of any activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d).  The Supreme Court further clarified the meaning of "commercial activity" under the FSIA in Republic of Argentina v. Weltover:

8

> when a foreign government acts, not as a regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are "commercial" within the meaning of the FSIA….[T]he question is not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives.  Rather the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in "trade and traffic or commerce."

504 U.S. 607, 614 (1992) (internal citations omitted).

The claims asserted here against CCTV fall into two distinct categories for purposes of the "commercial activity" analysis.  First, there are claims stemming from the CCTV broadcast of television programs and dissemination of information on their website.  Second, there are claims stemming from security officials' use of CCTV programs, particularly "Same Song," in the torture and brainwashing of Falun Gong practitioners.  The latter claims are plainly not based on "commercial activity," as torture and brainwashing are not actions by which private parties engage in commerce.  The mere fact that it incorporated materials originally produced for commercial purposes does not convert torture into a commercial action.[6]

The broadcast of television programs and the dissemination of news, however, are clearly activities by which private individuals and corporations engage in commerce. See Bryks v. Canadian Broadcasting Corp., 906 F.Supp. 204, 207-208 (S.D.N.Y. 1995) (finding that news broadcast by stated-owned Canadian television network constituted "commercial activity" under the FSIA).  It is therefore clear that CCTV's general activities are "commercial" under the FSIA, notwithstanding its control by the PRC government.  The relevant question is not, however, whether CCTV's

---

[6] The Court also notes that the Complaint is barren of allegations that CCTV was responsible, and therefore potentially liable, for the use of their programs in torture or brainwashing.

programming is "commercial" in general, but whether the particular activities on which Plaintiffs' claims are based are "commercial."

Here, Plaintiffs own allegations make clear that the CCTV activities designed to incite abuses against Falun Gong practitioners were not commercial in nature. According to the Complaint, the relevant material was created and disseminated "in concert" with the Central Committee of the CCP and the PRC's Ministry of Propaganda. Compl. ¶ 1. The Complaint further alleges that the programs at issue were part of a "campaign of propaganda" authorized and planned at the highest level of the CCP and the PRC government. Id. at ¶ 20. Courts considering similar activities by state-owned press organizations have found that when the organization produces material as the official voice of the government, it acts in a governmental and not a commercial capacity, notwithstanding its broader commercial activities. See Gregorian v. Izvestia, 871 F.2d 1515, 1522 (9th Cir.), cert. denied, 493 U.S. 891 (1989) (finding no commercial action where stated-owned Soviet newspaper Izvestia was acting as the "voice of an official Soviet agency"); Yessenin-Volpin v. Novosti Press Agency, 443 F.Supp. 849, 856 (S.D.N.Y. 1978) (finding that Izvestia acted in a governmental capacity when producing "official commentary" of the Soviet regime).

These cases are directly on point; CCTV was acting as the "voice of an official agency," the Ministry of Propaganda, and the programs it produced were "official commentary" of the PRC. Plaintiffs explicitly allege that CCTV is "the *mouthpiece* of the Chinese Communist Party and has followed its plans and mandates as well as those of the Central Propaganda Department." Compl. ¶ 32 (emphasis added). Moreover, CCTV entirely lacks the "insulat[ion] from the political influence of [government] policy-

"makers" upon which the court relied in Bryks to find that the Canadian Broadcasting Corporation's news programs constituted commercial activity. Bryks, 906 F.Supp. at 208. The Court therefore finds that CCTV's broadcast and website distribution of inciting materials is governmental activity, and may not form the basis for a suit in this Court under the FSIA.[7]

## CONCLUSION

Plaintiffs' complaint is dismissed in its entirety due to the Court's lack of subject matter jurisdiction. The Clerk of the Court is directed to close out this case.

Dated: New York, New York
August 9, 2007

SO ORDERED

/s/ Paul A. Crotty

PAUL A. CROTTY
United States District Judge

---

[7] CCTV's broadcasting of non-political programs such as Same Song would not appear, based on the Complaint, to fall into this category. None of Plaintiffs' claims involve the broadcast of these programs, however, but rather exclusively relate to their use in torture and brainwashing. Similarly, while the New York performance of Same Song is a commercial activity, it does not support Plaintiffs' claims against CCTV, except possibly as an element of Plaintiffs' damages.